[No. A115570. First Dist., Div. One. Aug. 29, 2008.]

CITY OF CLOVERDALE, Cross-complainant and Appellant, v. DEPARTMENT OF TRANSPORTATION, Cross-defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. and III.

**COUNSEL**

Lepper & Harrington and Gary M. Lepper for Cross-complainant and Appellant.

Bruce A. Behrens, David Gossage and Lucille Y. Baca for Cross-defendant and Respondent.

**OPINION**

**MARCHIANO, P. J.**—This lawsuit concerns a drainage channel constructed by the Department of Transportation (Department) when it rerouted Highway 101 to bypass the center of the City of Cloverdale (City). Nearby property owners (plaintiffs) sued the Department and the City for flooding caused by the drainage channel, and the City cross-complained against the Department for indemnity, damages, and declaratory relief. Plaintiffs settled with the City and obtained a judgment on jury verdicts for damages against the Department. Judgment was entered for the Department on the City's cross-complaint.

A threshold issue in the case was whether the Department, after completing the bypass project, effectively relinquished title to the drainage channel to the

City. That issue was tried to the court, and the court determined that title was in fact relinquished. The court subsequently ruled for the Department on the City's indemnity claim, and granted in part the Department's motion to dismiss other City causes of action. This appeal by the City contests the relinquishment, indemnity, and dismissal rulings.

In the published portion of this opinion, we set forth our reasons for affirming the relinquishment ruling, which include the City's failure to exhaust an administrative remedy by which the relinquishment could have been challenged. In the unpublished portion, we explain our reversal of the indemnity ruling and affirmance of the dismissal ruling. The court determined from an analysis of the settlement agreement and the jury verdicts that the City was not entitled to equitable indemnity from the Department. We disagree with that ruling and conclude that a retrial of the indemnity issue is required.

## I. RELINQUISHMENT

A. *Background*

The Department and the City entered into a Freeway Agreement in August 1990 providing for the bypass project; the project was completed in 1994. The drainage channel at issue is in Cloverdale and was built as part of the bypass project. The project included construction of Asti Road, a frontage road that disrupted the natural course of Heron Creek, so the creek was reconfigured to run through the drainage channel, which lies next to the frontage road.

Robert Perrault, city manager from 1990 to 2000, told the Department in a June 1992 letter that the City "will maintain the constructed improved channels within the City limits upon their relinquishment from Caltrans to the City. It is the City's understanding that this relinquishment will occur after the Cloverdale Bypass is completed and after the three year plant establishment phase and the five year monitoring for assessing the success of the riparian vegetation."

Perrault advised the Department in a February 1994 letter of a "drainage problem" with "the channelization at Heron Creek." He said that "the present system is not working. After very modest rainfall, substantial ponding is occurring at the bottom of the channel. The City believes this ponding presents a potential health and safety problem and will also inhibit the City's

ability to maintain the channel once it is relinquished. [¶] I am requesting CalTrans resolve these issues. Prior to the City assuming any responsibility for the channel, it must drain properly and be in a state that will enable easy maintenance."

The City received a "Notice of Intention to Relinquish Highway Right of Way" pursuant to Streets and Highways Code section 73[1] from the Department on December 6, 1996. Section 73 provides for relinquishment to a county or city by the California Transportation Commission (Commission) of: (1) "any portion of any state highway within the county or city that has been deleted from the state highway system by legislative enactment"; (2) "any portion of any state highway that has been superseded by relocation"; (3) certain "frontage or service road[s] or outer highway[s]"; and (4) certain "nonmotorized transportation facilit[ies]." The frontage road provision, and the relevant balance of the statute, are as follows:

"Whenever the [D]epartment and the county or city concerned have entered into an agreement providing therefor, or the legislative body of the county or city has adopted a resolution consenting thereto, the [C]ommission may relinquish, to that county or city, any frontage or service road or outer highway, within the territorial limits of the county or city, which has a right-of-way of at least 40 feet in width and which has been constructed as a part of a state highway project, but does not constitute a part of the main traveled roadway thereof. . . .

"Relinquishment shall be by resolution. A certified copy of the resolution shall be filed with the board of supervisors or the city clerk, as the case may be. A certified copy of the resolution shall also be recorded in the office of the recorder of the county where the land is located and, upon its recordation, all right, title, and interest of the state in and to that portion of any state highway shall vest in the county or city, as the case may be, and that highway or portion thereof shall thereupon constitute a county road or city street, as the case may be. [¶] . . . [¶]

"Prior to relinquishing any portion of a state highway to a county or a city, except where required by legislative enactment, the [D]epartment shall give 90 days' notice in writing of intention to relinquish to the board of supervisors, or the city council, as the case may be. . . . [¶] . . . [¶]

---

[1] All further statutory references are to the Streets and Highways Code unless otherwise indicated.

"Within the 90-day period, the board of supervisors or the city council may protest in writing to the [C]ommission stating the reasons therefor, including, but not limited to, objections that the highway is not in a state of good repair, or is not needed for public use and should be vacated by the [C]ommission. In the event that the [C]ommission does not comply with the requests of the protesting body, it may proceed with the relinquishment only after a public hearing given to the protesting body on 10 days' written notice."

Attached to the notice to the City was a copy of the relinquishment resolution to be presented to the Commission. In accordance with the statute, the notice advised that the resolution would not be taken up by the Commission until 90 days after the notice was received. The notice specified where objections should be sent.

The relinquishment resolution recited that, in the freeway agreement, the City had agreed to accept title to "frontage roads, reconstructed and relocated city streets and cul-de-sacs" upon relinquishment by the State of California, and that the state "ha[d] acquired right of way for and ha[d] constructed the above-mentioned collateral facilities in the City" pursuant to the agreement. The property to be relinquished was "all of the State of California's right, title and interest in and to said collateral facilities in said City, together with the right of way and appurtenances thereof, described as follows: [¶] Segments 3, 4, 5, 6, 8 and 9, as shown on that certain set of maps of 13 sheets" to be filed in the Sonoma County (County) Recorder's office. The 13 maps were attached to the resolution. The first map gave an overview of the 12 segments to be relinquished, some to the City and some to the County, and showed how the areas to be received by the City and County were shaded differently; maps of the individual segments followed.

The maps were interpreted at the trial of the relinquishment issue by Matthew Goetz, a land surveyor working in the right-of-way section of the Department. Goetz did not prepare the maps; he was asked to review them and assess what they revealed. He testified that the maps depicted the boundaries of the areas to be relinquished, and constituted "a technical description of the real property to be transferred." He said that the drainage channel in question was located within segment 6, one of the segments to be given to the City as shown on the maps. One of the maps of segment 6 bore the label "Frontage Road," but no topographical features were shown and the drainage channel was not identified by any words or markings. Goetz said that the letters "FR" on the maps were shorthand for "frontage," and the

" 'FR' Line" shown on the maps of segment 6 was the center line of Asti Road. He said it was readily apparent from the size of the shaded area around this center line that the area to be relinquished was "much wider than the rights-of-way that are normally associated with a road." One could have taken the maps and a tape measure out to the center of the road, walked the length of the shaded area shown on the maps, and determined that it included the drainage channel.

The City did not protest the relinquishment during the 90 days following receipt of the notice. Perrault testified at trial that he reviewed the notice and "could not discern that it covered the channel," and that he "relied on the recommendation and assurance of the City Engineer," John Wanger. Perrault said that, to the best of his recollection, Wanger reviewed the notice during the 90-day period and did not find anything objectionable, but Wanger testified in his deposition that he did not get a copy of the notice from Perrault until after the 90 days had expired.

The relinquishment resolution was approved by the Commission on April 2, 1997, and recorded with the Sonoma County Recorder on May 2, 1997. The City received a recorded copy of the resolution three weeks later.

After the relinquishment, the City continued complaining to the Department about the condition of the drainage channel. Wanger wrote the Department a letter on June 18, 1997, noting the City's long-standing concern with the flat slope of the channel, and pointing out problems the channel was posing to a nearby City facility. Among other things, it appeared that "a 36 [inch] storm drain with a flap gate installed through the dike between the corporation yard and Heron Creek . . . allow[ed] flows from Heron Creek to flow adversely back into the City corporation yard ditches." The City "appreciate[d] the State's commitment to performing the remedial drainage work" the Department had identified in a letter dated April 22, 1997. In a September 25, 1997 letter, Wanger listed the City's "minimum" expectations of the Department, which included installation of "appropriate sized pipe(s) . . . through the levy to replace the existing undersized pipe with the faulty flap gate." The Department proceeded to replace the 36-inch pipe with two 48-inch pipes, but Wanger thought that the new pipes were installed at an incorrect elevation, and wrote to the Department in December 1997 asking how it proposed to remedy that defect.

Wanger testified that he did not realize the Department considered the channel to be part of the relinquished property until he was so advised by Department officials at a meeting in late 1997 or early 1998. Wanger told the Department officials that the City did not agree that the channel had been relinquished.

Wanger acknowledged at trial that, in the relinquishment, the City had received a right-of-way from the Department. "Q. What you got from CalTrans was right-of-way, wasn't it? [¶] A. Yes. [¶] . . . [¶] Q. You knew you were getting titled boundaries as identified in the right-of-way; correct? When that's relinquished? [¶] A. That's correct. [¶] Q. What was formerly the State property was now your property from the limits of the right-of-way; correct? [¶] A. Correct. [¶] Q. From the width of the right-of-way as depicted on maps that you received; correct? [¶] A. Correct."

However, at another point during this exchange, Wanger denied knowing what the City received when it obtained the right-of-way. He elaborated: "This was the first relinquishment that I as . . . an engineer had gone through with CalTrans, and my experience with the City is such that—let's say somebody was going to give us a right-of-way on a map or on a separate document. The City would generally accept the right-of-way but would not necessarily accept the improvements, and this is my experience, until those improvements were in a condition that the City felt was appropriate. And in this particular case I felt I didn't have any issues with Asti Road, but we clearly had documented, gosh, since 1992 that we had issues with the drainage channel . . . ."

Perrault conceded that no one in the Department ever told him the channel would not be relinquished, but while he had "anticipated the relinquishment of the channel," he believed that the channel "would have to work correctly before the City would be in a position to be able to accept it."

B.  *Discussion*

(1)  *Whether Section 73 Authorized Relinquishment of the Drainage Channel*

The City contends that section 73 does not permit relinquishment of the drainage channel. Section 73 does not appear to have been construed in any reported case.

█   As has been noted, section 73 provides for relinquishment of "highway[s]," "road[s]," and "transportation facilit[ies]." Section 23 states that "[a]s used in this code, unless the particular provision or the context otherwise requires, 'highway' includes bridges, culverts, curbs, drains, and all works incidental to highway construction, improvement, and maintenance." A

drainage channel created to replace a creek displaced by a new highway could literally be characterized as a "drain," and would unquestionably constitute a "work[] incidental to highway construction" within the meaning of section 23. Therefore, "unless . . . the context otherwise require[d]," relinquishment of a highway would include relinquishment of a drainage channel necessitated by the highway's construction.     ▪     The City concedes that section 73 does not distinguish, as to the scope of what may be relinquished, between a "highway" and a "road." The concession is well taken; nothing in the statute suggests such a distinction. Accordingly, unless the context dictates otherwise, the relinquishment of Asti Road, the frontage road in this case, included relinquishment of the drainage channel that was built to permit the construction of that road.

The City does not explain why the context of a relinquishment would require any other result. The City simply dismisses section 23 as one among "an array of statutes" where "different definitions apply in different contexts." However, unlike the other statutes the City cites, section 23 bears directly on section 73: It defines the scope of the term "highway" in section 73, and thus, per the City's apt concession, the scope of the term "road" in section 73 as well. We see no reason why the Legislature would provide for relinquishment of highways and roads, but prohibit relinquishment of the works incident to their construction. Consequently, we conclude that the drainage channel could be relinquished as part of the frontage road under section 73.

### (2)   *Whether a Relinquishment Occurred*

#### (a)   *The Freeway Agreement*

Section 73 requires an agreement between the Department and the city or county for relinquishment of a frontage road. Paragraph 4 of the Freeway Agreement in this case authorized the Department to acquire on the City's behalf "all necessary right of way as may be required for construction, reconstruction, or alteration of CITY streets, frontage roads, and other local roads" in connection with the bypass project. Paragraph 6 provided: "CITY will accept control and maintenance over each of the relocated or reconstructed CITY streets, and the frontage roads, and other [Department] constructed local roads on receipt of written notice to CITY from [Department] that the work thereon has been completed, except for any portion which is adopted by [Department] as a part of the freeway proper. CITY will accept title to the portions of such roads lying outside the freeway limits, upon relinquishment by [Department]."

■ The City refers to an "absence of even an oblique reference to 'drainage facilities' in the 1990 Freeway Agreement," and, presumably to point up the alleged omission, underlines the references to "roads" in its quotation of paragraph 6. However, the terms "frontage road" in the paragraph of the Freeway Agreement dealing with relinquishment would likely have the same meaning as in the relinquishment statute, which, as we have said, includes drains and other works incidental to construction. This understanding was confirmed by City Manager Perrault's June 1992 and February 1994 letters to the Department, which contemplated that drainage channels would be part of the relinquished property. (See generally 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 749, p. 838 [parties' subsequent conduct may establish meaning of contract]; CACI No. 318 (2008) [same].) Perrault admitted at trial that he had anticipated relinquishment of the channel at issue. Thus, the City does not deny that it was "well aware that the drainage channel would be relinquished" after construction was completed, nor does it dispute that the Freeway Agreement was one that provided for relinquishment of frontage roads as required by section 73.

■ The City nonetheless believes that the Department was not unilaterally entitled to decide when work on the channel was complete, and it reads the Freeway Agreement to provide for a "consensual" future acceptance of the channel. The text of the agreement does not support these positions. The agreement states in mandatory terms that the City "will accept" control and maintenance of completed frontage roads and title to such roads upon relinquishment by the Department. This language does not purport to depart from section 73, which requires an advance agreement for relinquishment, but provides that a relinquishment can ultimately be accomplished over a city's objection.

(b)    *Relinquishment Notice and Resolution*

The City contends that the notice of relinquishment it received and the resolution of relinquishment thereafter recorded did not effectively transfer title to the drainage channel. This issue, as the City implicitly concedes, is essentially one of fact, governed for purposes of appellate review by the substantial evidence rule. Substantial evidence supported the trial court's findings "that the notice of relinquishment did in fact put the City on notice that the drainage channel would be relinquished and that the recorded relinquishment did in fact convey the drainage channel to the City."

The resolution, furnished with the notice, provided for relinquishment of "collateral facilities" that included "frontage roads," "together with the right of way and appurtenances thereof" as shown on attached maps. The drainage channel, again, could be part of a frontage road, and City Engineer Wanger

confirmed in his testimony that the City received rights-of-way in the relinquishment. Thus, the only question was whether the channel was shown on the maps to be within a frontage road right-of-way conveyed to the City. The only evidence on this issue was the testimony of Department surveyor Goetz, who indicated that the maps were precise legal descriptions of the areas conveyed, and that the channel was located within one of those areas. That testimony fully supported the court's finding that notice and resolution were adequate to transfer title to the drainage channel to the City.

■ The City observes that the maps did not depict or identify the channel itself, but cites no authority for the proposition that any such description was legally required to effectuate the transfer of title. A deed will generally "be sustained if it is possible from the whole description to ascertain and identify the land intended to be conveyed with reasonable certainty." (*Denbo v. Senness* (1953) 120 Cal.App.2d 863, 866 [262 P.2d 31]; see, e.g., *Blume v. MacGregor* (1944) 64 Cal.App.2d 244, 251–252 [148 P.2d 656] [description is generally sufficient "if a competent surveyor can take the deed and locate the land on the ground . . . with or without the aid of extrinsic evidence"].) Goetz explained how relinquishment of the channel could be determined by taking the maps into the field, and the City offered no evidence that called that explanation into question.

### (c) *Administrative Remedy*

The City argues that the drainage channel was not relinquished because it was not prepared to accept the channel unless it was satisfied with how the channel worked, and had conveyed that position to the Department before it received the relinquishment notice. This argument flows from a misconception that a relinquishment is consensual, which, again, it ultimately is not. Moreover, section 73 afforded a means of protesting the relinquishment on the ground that the channel was "not in a state of good repair." In that event, the Commission would have been required to hold a public hearing to resolve the issue. That issue is not properly before us because the City failed to pursue that administrative remedy.

■ "[W]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942].) This rule "is not a matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts." (*Id.* at p. 293.) "Exhaustion of *administrative* remedies is 'a jurisdictional prerequisite to

resort to the courts.' [Citation]." (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70 [99 Cal.Rptr.2d 316, 5 P.3d 874].) The exhaustion doctrine "has been successfully invoked as a bar to legal proceedings in a wide variety of situations" (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 308, p. 393), including Commission proceedings (see *People ex rel. Dept. of Transportation v. Cole* (1992) 7 Cal.App.4th 1281, 1286 [9 Cal.Rptr.2d 750]). The doctrine precludes the City from contesting the relinquishment based on the channel's alleged defects.

The City contends that exhaustion doctrine cannot be invoked here because the relinquishment notice did not adequately advise that the drainage channel would be included (see *Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 384 [216 Cal.Rptr. 733, 703 P.2d 73] [doctrine not applicable where party not advised that administrative review procedure was available]), but we have already explained that the notice with respect to the channel was sufficient. The City protests that it "genuinely did not realize" that the channel was to be relinquished, but the City has only itself to blame for that ignorance. According to the evidence, the City neglected to have the maps in the notice examined during the 90-day period when the relinquishment could have been contested; Perrault and Wanger essentially pointed the finger at each other for that failing.

The City notes that a court can agree to hear a case involving important questions of public policy even if the arguments as to those issues would ordinarily be waived by virtue of the exhaustion doctrine (*Lindeleaf v. Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 870–871 [226 Cal.Rptr. 119, 718 P.2d 106]), and the City submits that issues involving section 73 are important enough to warrant that treatment. However, defects in the drainage channel and the City's unwillingness to accept relinquishment of the channel in light of those defects are not matters of general public interest. The trial court correctly accepted the Department's exhaustion of administrative remedies argument as to those issues, and we can assume without deciding that the exhaustion doctrine would not apply to the other relinquishment issues we have discussed.

## II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 488.

## IV. DISPOSITION

The judgment for the Department on the City's cross-complaint is reversed on the indemnity causes of action, and is otherwise affirmed. The parties shall bear their own costs on appeal.

Stein, J., and Margulies, J., concurred.

A petition for a rehearing was denied September 22, 2008, and appellant's petition for review by the Supreme Court was denied December 10, 2008, S167256.